UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   19-14035-CR-ROSENBERG/MAYNARD

**UNITED STATES OF AMERICA**

vs.

**DENNIS BIRDSALL,**

      **Defendant.**
_____/

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR DOWNWARD VARIANCE**

Comes now the United States of America, by and through the undersigned Assistant United States Attorney, and hereby submits its Response to the Motion for Downward Variance filed by the defendant, Dennis Birdsall ("Birdsall"), in the above-captioned case:

**BACKGROUND**

On July 11, 2019, a federal grand jury in the Southern District of Florida returned an indictment charging TentLogix, Inc. ("TentLogix"), Gary Hendry ("Hendry"), Birdsall, and Kent Hughes ("Hughes") with conspiring to harbor aliens for the purpose of commercial advantage or private financial gain in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I) (Count One), and Hendry and Birdsall with causing false statements to be made in a matter within the jurisdiction of the executive branch of the United States in violation of Title 18, United States Code, Section 1001(a)(2) (Count Two).  (Doc. No. 1.)  On August 19, 2019, Birdsall pleaded guilty to the conspiracy charge pursuant to a written plea agreement with the United States.  (Doc. Nos. 63-65, 67, 69.)[1]   Birdsall also agreed to forfeit $170,943.00 to the United States, which

---

[1] Hughes pled guilty to the conspiracy charge on August 2, 2019, and was sentenced to three years

1

represents the amount of gross proceeds Birdsall personally obtained as a result of his participation in the conspiracy. (Doc. No. 65.) Birdsall satisfied his forfeiture obligation to the United States on August 19, 2019.

Birdsall's sentencing hearing is scheduled for November 13, 2019. The Presentence Investigation Report ("PSI") shows his advisory sentencing guideline range to be 33 – 41 months based on a total offense level of 20 and criminal history category of I, which includes a six-level enhancement under USSG § 2L1.1(b)(2)(B) because the offense involved the harboring of at least 25 but less than 100 aliens, a three-level enhancement under USSG § 3B1.1(b) for being a manager or supervisor of criminal activity that involved five or more participants or was otherwise extensive, and a two-level enhancement under USSG § 3C1.1 for obstruction of justice. (PSI at ¶¶ 34, 36-37, 40, 45, 80.)

On October 2, 2019, Birdsall filed written objections to the PSI, to which the United States has responded. (Doc. Nos. 91, 103.) In sum, Birdsall objects to the application of a three-level aggravating role enhancement under USSG § 3B1.1(b), and two-level obstruction of justice enhancement under USSG § 3C1.1. The United States respectfully submits both enhancements are properly applied in this case. Bidsall's objections to the PSI remain pending.

On October 16, 2019, Birdsall filed the instant motion, in which he requests a downward variance pursuant to 18 U.S.C. § 3553(a). (Doc. No. 105.) Specifically, Birdsall seeks a non-custodial sentence in the form of "home confinement followed by supervised release." The United States respectfully submits a downward variance is not warranted, and that a sentence at

---

of probation and a $7,500 fine, *after the Court granted the United States' motion for downward departure under USSG § 5K1.1*. (Doc. Nos. 38-40, 42, 52, 99, 111-12.) Hendry pled guilty to the conspiracy charge on September 25, 2019, and is set to be sentenced on December 5, 2019. (Doc. Nos. 82, 87, 96-97.)

the bottom of Birdsall's advisory guideline range is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate general deterrence, and avoid unwarranted sentencing disparities.

## ANALYSIS

### *Nature and Circumstances of the Offense*

As with any request for a variance, the nature and circumstances of the offense present a good starting point.

TentLogix is a Florida corporation that was established in 1996. TentLogix provides event-related services, including the rental and installation of tents and other temporary structures, for private and corporate gatherings throughout the continental United States. TentLogix is headquartered in Fort Pierce, Florida, and employs hundreds of workers, many of whom are manual laborers. (PSI at ¶ 8.)

In 2016, 2017, and 2018, Birdsall was the president of TentLogix and Hendry was the chief executive officer and majority owner of the corporation. In 2016, TentLogix generated more than $21,000,000 in gross receipts and $10,000,000 in gross profit from its business operations. In 2017, TentLogix generated more than $36,000,000 in gross receipts and $14,000,000 in gross profit from its business operations. (Doc. No. 64, Stipulation of Facts and Acknowledgment of Offense Elements in Support of Guilty Plea, at pg. 1; PSI at ¶¶ 10-11, 12.)

From January 2016 to March 2018, TentLogix employed scores of aliens knowing those aliens had entered and remained in the United States unlawfully. During this time frame, a large portion of TentLogix's workforce in the Southern District of Florida was comprised of aliens who were not authorized to work in the United States. (PSI at ¶ 9.)

3

On April 11, 2016, Homeland Security Investigations ("HSI") served TentLogix with a Notice of Inspection. A Notice of Inspection is the procedure by which HSI initiates an audit of a business's employment records. HSI requested TentLogix to produce Form I-9s for all of its employees. Form I-9 is used for verifying the identity and employment authorization of individuals hired for employment in the United States. All United States employers must ensure proper completion of Form I-9 for each individual they hire for employment in the United States. (Doc. No. 64 at pg. 2; PSI at ¶ 12.)

On April 26, 2016, TentLogix provided HSI with Form I-9s for approximately 164 employees in response to the Notice of Inspection. On July 19, 2016, based on a review of the Form I-9s that TentLogix provided, HSI identified 96 TentLogix employees who appeared to be aliens unauthorized to work in the United States. HSI provided TentLogix with a list of the 96 employees, and warned TentLogix it could be subject to criminal charges if it continued to employ these aliens. Birdsall was aware of HSI's audit and HSI's admonition to TentLogix that it could be subject to criminal charges if it continued to employ aliens who were not authorized to work in the United States. (Doc. No. 64 at pg. 2; PSI at ¶ 13.)

Instead of heeding HSI's admonition, TentLogix, through its corporate officers, Hendry and Birdsall, orchestrated a façade of compliance that permitted the corporation to continue profiting from the use of illegal labor for at least another year. Specifically, in early 2017, Hendry, Birdsall, and Hughes met at Hendry's residence in Martin County, Florida, and devised a scheme to "transfer" the aliens employed by TentLogix who were not authorized to work in the United States to KH Services, LLC ("KH Services"), which was to be established by Hughes, so that they no longer appeared on TentLogix's payroll. The purpose of the scheme was to conceal, harbor, and shield the aliens who worked for TentLogix from HSI's audit. Hendry agreed to cover all of

4

the costs associated with KH Services, and agreed to pay Hughes a fee for each alien who was transferred from TentLogix's payroll to KH Services' payroll.  (Doc. No. 64 at pgs. 2-3; PSI at ¶ 14.)

Birdsall made GMC, who was a supervisor at TentLogix, aware of the scheme and *directed* GMC to tell the aliens employed by TentLogix to obtain new identities, including social security numbers, which GMC did.  GMC was primarily responsible for recruiting the aliens who worked for TentLogix, most of whom were from Guatemala.  (Doc. No. 64 at pg. 3; PSI at ¶ 15.)  Birdsall was the president of the corporation.  GMC was in his direct chain of command.

Birdsall then *directed* TentLogix's attorney to falsely represent to HSI that TentLogix was in the process of terminating the 96 employees HSI had identified during its audit as aliens not authorized to work in the United States.  (Doc. No. 64 at pg. 3; PSI at ¶ 16.)  Over the course of several communications in 2017, TentLogix notified HSI, through its counsel, that most of the aliens identified by HSI had been terminated.  These communications were made between TentLogix's attorney and HSI Special Agent Dadre McCreary.  To be clear, Birdsall intentionally duped an unwitting attorney into lying to a federal law enforcement agency.

On March 20, 2017, Hughes formed KH Services for the sole purpose of concealing, harboring, and shielding the aliens employed by TentLogix from HSI's audit.  In April 2017, Birdsall delivered a $10,000 check to Hughes issued by TentLogix and made out to KH Services. On April 19, 2017, Hughes opened an account at Wells Fargo in Martin County in the name of KH Services and deposited the $10,000 check into that account.  Hughes was the sole member and manager of KH Services.  Hughes operated KH Services out of his residence in Martin County.  (Doc. No. 64 at pg. 3; PSI at ¶ 17.)

On May 5, 2017, TentLogix, through its attorney, falsely represented to HSI that 92 of the 96 aliens identified by HSI during its audit had been terminated when, in fact, those aliens continued to work for TentLogix under the guise of being employed by KH Services. (Doc. No. 64 at pg. 3; PSI at ¶ 19.)

In May 2017, most of the employees HSI had previously identified as aliens not authorized to work in the United States were transferred from TentLogix's payroll to KH Services' payroll. These aliens continued to work for TentLogix while purportedly being employed by KH Services. (Doc. No. 64 at pg. 3; PSI at ¶ 18.)

Between May 2017 and March 2018, TentLogix transferred over $3,000,000 to KH Services in 23 separate wire transfers for the express purpose of paying the aliens who continued to work for TentLogix. Birdsall directed the wire transfers to be sent from TentLogix's bank account at Seacoast Bank to KH Services' bank account at Wells Fargo. Birdsall provided Hughes with the hours worked and hourly rate for each alien on a bi-weekly basis based on timesheets he maintained at TentLogix. Birdsall maintained a code or "Rosetta Stone" that permitted him to identify each alien so that they correlated with the timesheets he provided to Hughes. Hughes then transmitted this information to Paychex, Inc. ("Paychex"), a payroll services provider, so that paychecks drawn on KH Services' bank account at Wells Fargo were generated for the aliens who worked for TentLogix. After the paychecks were issued, Birdsall obtained the paychecks from Hughes and caused them to be distributed to the aliens at TentLogix's headquarters in Fort Pierce. (Doc. No. 64 at pgs. 3-4; PSI at ¶¶ 20-21.)

On March 28, 2018, HSI executed a federal search warrant at TentLogix's headquarters in Fort Pierce. The façade of compliance finally collapsed. During the execution of the search warrant, HSI encountered and interviewed no less than 30 of the aliens TentLogix previously

advised had been terminated, several of whom provided false identities to law enforcement at the scene. These aliens worked for TentLogix but received their paychecks through KH Services.

To recap, Birdsall and Hendry orchestrated a fraudulent scheme that spanned several years, resulted in the harboring of at least 92 aliens, involved the formation and use of a shell company, the obstruction of a criminal investigation, and the use of an innocent attorney who repeatedly lied to a federal law enforcement agency at Birdsall's direction. Birdsall's attempt to shift the blame for his own misdeeds to others indicates he has yet to fully appreciate the gravity of his crime. It also calls into question whether he is truly remorseful or simply sorry he got caught.[2]

As for Birdsall's motive, he benefited directly and substantially from the conspiracy. In 2018, Birdsall received $450,000.00 in salary and bonuses from TentLogix. This was the largest amount of money Birdsall ever received from TentLogix during any one-year period. In 2017, during the height of the conspiracy, TentLogix generated more than $36,000,000 in revenue. With the exception of Hendry, Birdsall profited more than any other member of the conspiracy. Birdsall was paid handsomely for his role in the conspiracy and received a large portion of the fruits of the crime.

Finally, this was not a trivial crime. It is no secret that one of the primary reasons for illegal immigration is the chance of employment in the United States. The ability of illegal aliens to find and keep jobs depends to a considerable extent on unscrupulous employers willing to either look the other way, or, as here, actively obstruct immigration authorities. When enacting Section 1324, Congress expressly noted the pervasive problem of illegal alien employment and its harmful

---

[2] "A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility[.]" USSG § 3E1.1, comment. n.1(A).

effect on the American worker. *United States v. Zheng*, 306 F.3d 1080, 1087 (11th Cir. 2002). Indeed, "[e]ach time an employer hires an illegal alien, an American citizen loses an employment opportunity." *Id*. "Congress obviously sought not only to deter employers from directly joining forces with those who bring in illegal aliens but also to prevent employers from encouraging the practice by hiring aliens knowing that they had been brought in illegally." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1293 (11th Cir. 2010).

The nature and circumstances of the present offense counsel against a downward variance.

### *History and Characteristics of the Defendant*

The United States acknowledges Birdsall's criminal history is minimal. Birdsall's lack of criminal history, however, has already been adequately taken into account by virtue of his criminal history designation (Category I). Indeed, Criminal history category I is the lowest category, and "the lower limit of the guideline range for Criminal History Category I is set for a first offender with the lowest risk of recidivism." U.S.S.G. § 4A1.3 (policy statement). On the other hand, the fact Birdsall turned to crime later in life is particularly disconcerting, especially considering all the relationships he consciously placed at risk by his conduct.

The United States does not dispute that Birdsall's background reveals some instances of good character on his part. Nevertheless, Birdsall's prior good deeds, on balance, do not negate the gravity of his conduct and aggravating role he played within the conspiracy. A variance based on Birdsall's lack of criminal history is simply not appropriate in this case.

As for Birdsall's family ties and responsibilities, it is no secret that innocent family members often suffer the most as a result of a defendant's incarceration. This, however, simply begs the question – why did Birdsall consciously violate the law for several years knowing all

along he was putting his family in danger and their livelihood at risk?  Only Birdsall truly knows the answer to that question.

### *The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment for the Offense, Afford Adequate Deterrence, and Protect the Public from Further Crimes of the Defendant*

The offense Birdsall now stands convicted of is both serious and dangerous to the administration and enforcement of federal immigration law.  "[T]he legislative history of the adoption of § 3553 demonstrates [that] Congress viewed deterrence as particularly important in the area of white collar crime."  *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal marks and citation omitted).  That is because white collar crime, more so than most other offenses in the criminal code, "can be affected and reduced with serious punishment."  *Id.*  A non-custodial sentence in the form of home confinement would send the message that white collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty.  Rather than deter crime, a non-custodial sentence would suggest to those similarly situated to Hughes that they can profit from fraudulent conduct and, even if caught, escape severe consequences by cooperating with the government after the fact.  The threat of spending time on probation or home confinement simply does not, and cannot, provide the same level of deterrence as the threat of incarceration in a federal penitentiary for a meaningful period of time.

As the Eleventh Circuit recently cautioned in *United States v. Kuhlman*:

> [B]usiness criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity.  It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class.  But in this instance we must fight our nature. *Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.*

711 F.3d 1321, 1329-30 (11th Cir. 2013) (internal marks and citation omitted; emphasis added).

A guideline sentence is necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and most importantly, afford adequate general deterrence.

### *Parity in Sentencing*

Finally, Birdsall should expect to be treated like other similarly situated defendants. Parity in sentencing among similarly situated federal defendants across the country is fundamental to the proper administration of justice. This principle is embodied in Section 3553(a)(6), which "is concerned with national disparities among the many defendants with similar backgrounds convicted of similar criminal conduct." *United States v. Simmons*, 501 F.3d 620, 623 (6th Cir. 2007). Generally, "national uniformity is . . . taken into account by the Sentencing Guidelines, which are almost certainly the best indication of ordinary practice since most sentences are within the guidelines." *Id*. at 626 (internal marks and citation omitted). Indeed, "[e]ven after *Booker* rendered the Sentencing Guidelines advisory, district courts have *in the vast majority of cases* imposed either within-Guidelines sentences or sentences that depart downward from the Guidelines on the Government's motion." *Hughes v. United States*, 138 S.Ct. 1765, 1777 (2018) (internal marks and citation omitted; emphasis added).

A sentence at the bottom of Birdsall's guideline range adequately reflects the relevant 3553(a) factors, preserves the integrity of the Sentencing Guidelines, and promotes national uniformity by avoiding unwarranted sentencing disparities.

By way of comparison, the United States offers the following cases for the Court's consideration, which involve defendants who were convicted of conspiring to harbor aliens for the purpose of commercial advantage or private financial gain in violation of Title 8, United States

Code, Section 1324(a)(1)(A)(v)(I).  *See United States v. Yang*, 390 F. App'x 859 (11th Cir. 2010) (defendant who conspired to harbor aliens by arranging for their unlawful employment at Chinese restaurants received a within-guidelines sentence of 60 months' imprisonment); *United States v. Tipton*, 518 F.3d 591 (8th Cir. 2008) (defendants who conspired to harbor six aliens by employing them at a restaurant they owned and managed received within-guidelines sentences of 30 months' imprisonment and 27 months' imprisonment).

## CONCLUSION

For the above stated reasons, the United States requests the Court to impose a sentence at the bottom of Birdsall's guideline range.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:    **/s/Michael D. Porter**
Michael D. Porter
Assistant United States Attorney
Florida Bar# 0031149
101 South U.S. Highway 1
Suite 3100
Fort Pierce, Florida 34950
Telephone: (772) 293-0950
Email:michael.porter2@usdoj.gov

**CERTIFICATE OF SERVICE**

  I hereby certify that on October 25, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by either regular U.S. mail or inter-office delivery.

                **/s/Michael D. Porter**
                Michael D. Porter
                Assistant United States Attorney